**EXHIBIT 2**

KEN GOODMAN
GOODMAN vs. JACK COOPER TRANSPORT, et al.

July 31, 2015
65–68

Page 65

A  I had no problems in Wayne. My problem occurred when I came -- when I transferred -- did an intercompany transfer from Wayne to Lansing. I had been in and out of this woman's terminal on numerous occasions, and I had no recourse, no problems, no -- nothing. As soon as I transferred, the first week I transferred, I get fired. I didn't tear anything up, I haven't damaged any of her freight. Like I said, I -- I -- I've had -- I've hauled numerous cars out of the Lansing to the satisfaction of the company, and no damage, no damages or anything of that nature. This was a blindside to me.

Q  Besides Margo Hopkins, is there anybody else at Jack Cooper that you believe has discriminated against you based on your race?

A  Her and whoever else that orchestrated this -- this -- this ordeal. I just -- I can only speak about her right now, her and the labor relations guy, Jerry Clemens.

Q  Are you saying that you believe Jerry Clemens has discriminated against you based on your race?

A  Per the information that I saw, they got some -- some -- some bad information and they reacted to it in a negative, condescending way. They fired me, you know. I did my job --

Page 66

Q  Just to be clear, do you think that anyone besides Margo Hopkins has discriminated against you based upon your race?

A  I think Margo was the main culprit.

Q  How about Jerry Clemens, just so we're clear? Do you think that Jerry Clemens has discriminated against you based upon your race?

A  My interactions with Jerry was in a disciplinary action at the -- at the panel hearing, and I believe everything falls on Margo.

Q  So Bill Sherry at the Wayne terminal, no complaints?

A  No complaints, no.

Q  Randy Schumacher, no complaints of discrimination against him?

A  None.

Q  Same question for Bill Apatcallar?

A  Pat? Weird, but no.

Q  Brian Dunbar, no complaints that Brian Dunbar has discriminated against you based on your race?

A  No.

Q  What do you allege Margo Hopkins did to you based upon your race?

A  I transferred in with three Caucasian drivers, and per my knowledge, I did an in-company transfer, and she went back through my -- my file -- my application with

Page 67

a fine-tooth comb and brought up this -- this stuff that we're dealing with right now, and I don't believe she got into the three guys. There's another guy that came in with me, Linden Hardel, who was at Cassens with me also. He had a total -- he totaled out a vehicle at Cassens. He lost his job, and the Teamsters placed him at Allied and when Allied, you know, tried to strong arm GM, he -- he leveraged in from Allied to Jack Cooper over in Fort Wayne, Michigan -- I mean, Fort Wayne, Indiana. So he and I met up again once we both transferred. I transferred from Wayne, Michigan, he transferred from Fort Wayne, Michigan [sic], and his application wasn't reviewed like mine was, and he has a total -- totalled out vehicle on his -- on his also and probably other numerous things.

As to the other two Caucasian guys, I can't say anything about them because I don't know, but I know Linden personal -- personally because I worked with him at Cassens in Detroit. I know for a fact that he totaled out a vehicle, but yet here I am sitting before you all fighting for my job still but they're working.

Q  And it's your testimony that Linden Hardel is Caucasian?

A  Yes.

Q  What else do you think, if anything, that Margo Hopkins

Page 68

did to you because of your race?

A  She scrutinized my application. She went looking for something to -- to -- to fire me on, to get me out of there. All I wanted to do is work and support my family and self. I'm a single parent. I had two kids -- I got six kids all together; I have two kids in the household and two -- one that was freshman in college one that's -- one that was on her way to college. You know, I was just a dad just trying to make a living.

Q  Now, besides looking at your application and looking for something to get you out, anything else that Margo Hopkins did that you believe is because of your race?

A  She's just -- she's not a fair person I believe, you know, because when I first went there, my first back haul there, she was in the -- in the dispatch lobby area, and she saw me and she looked at me and said, oh -- she said, where you out of. I said, I'm out of Wayne. And her words were to me, oh, they hired you. And I was like, yes, they did, and I went and sat down and went and got my back haul and got on out of there.

Q  Did you ever talk to Margo Hopkins at any other time while a Wayne Jack Cooper driver besides this first back haul?

A  Not that I can remember.

Q  Anything else that you and Margo Hopkins talked about



KEN GOODMAN
GOODMAN vs. JACK COOPER TRANSPORT, et al.

July 31, 2015
105–108

Page 105

A    I'm sorry.

Q    Thank you.  We're definitely putting Stefanie through her paces.  Back to that question.  You left off Cassens and Leaseway because you knew that your record of being terminated from those companies would have hurt your chances of getting hired at Jack Cooper?

A    I didn't work at Leaseway long enough to do anything.

Q    I'm not talking about how long you worked there.

A    Two, three weeks.  How could that have --

Q    I'm talking about why you left them off your employment application at Jack Cooper.

A    Because I didn't feel like it was relevant to put them on there.

Q    Getting fired from another car hauler, the exact same type of job that you're applying for, is not relevant?

A    No, it's not because there are other guys there in the industry still that have been fired from other car haulers that are working over at Jack Cooper right now.

Q    That's right, but they --

A    I don't know what they put on their applications.  I don't know.  I've already told you that.  I don't know, I don't know, I don't know.

Q    Besides Linden Hardel who you believe got fired from Cassens because Linden Hardel told you that, right?

A    I was -- I was working the night he tore up the

Page 106

vehicle.

Q    So you don't know whether he got fired from Cassens or not?

A    He got fired from Cassens.

Q    How do you know that?

A    He went through the process, the grievance hearing, he went to the panel hearing.

Q    How do you know these things?

A    Because we as drivers, we talk and shop talk.

Q    Rumor mill?

A    It wasn't rumor.  Shit, he wasn't there no more.  Pardon my language.  He wasn't there no more.

Q    He's gone.

A    Yeah.

Q    You don't know whether he quit or not though?

A    He didn't quit.  They pulled -- they put him -- they put him on blast.  They put his -- they took the total unit, and they put it in front of the Conners yard, dispatch trailer, for every driver to see.  So if you make these kind of mistakes, your behind is gone.

Q    Someone said that at Cassens?

A    That's basically what the message was when they posted that.

Q    No one said that?

A    That's -- that's what they were trying to imply, okay?

Page 107

That's just like Mothers Against Drunk Driving when they post a car that's been all smashed up and mangled and they sit it out somewhere and trying to show these students, hey, don't drink and drive or people in general, don't drink and drive.  They show you the consequences of what can happen if you do.  Well, basically that's what they were showing us the consequences of, if you leave your decks up and you go down the road and you hit a bridge and you total out a vehicle, that's -- that's what we all perceived as drivers.  And they took his totaled out vehicle and stuck it in front of that trailer.

Q    So do you know whether or not the Pope brothers have been terminated from Cassens?

A    I can't answer that question.  I know they've had damages, and they've came down and got hired at Jack Cooper with no problems.

Q    But you don't know whether or not they were fired from Cassens?

A    I can't answer that.

Q    Jeff Dildine, do you know whether or not he was fired from a prior employer?

A    I believe Jeff was -- from what I was allegedly told, he was let go.

Q    From who?

Page 108

A    From Cassens by one of the higher up, Walker.  Somebody to that --

Q    Who told you that he was allegedly let go?

A    One of the -- one of the drivers.  Joe.

Q    Joe who?

A    Joe Jackson.

Q    Joe Jackson.  Okay.

A    Yeah.

Q    Who is Joe Jackson?

A    Joe Jack is a shuttle with Cassens Transport Company.  He and I hired in I think a couple months apart, about a month or so apart.  About a month apart.  I came in in March, he came in in April.

Q    Did Joe Jackson ever work for Jack Cooper as far as you know?

A    He's made attempts to - he's put in applications, and he wasn't -- he wasn't granted employment.

Q    Where is Joe Jackson working now as far as you know?

A    He's still at Cassens.

Q    Where has he applied to work for at Jack Cooper?

A    Wayne, Lansing.  Yeah, Wayne and Lansing.

Q    What have you and Joe Jackson spoken about as it relates to your lawsuit?

A    What have we spoken about?

Q    Yes.



KEN GOODMAN
GOODMAN vs. JACK COOPER TRANSPORT, et al.

July 31, 2015
125–128

Page 125

okay, but you call it -- you're calling it falsification or this and that. I did not falsify my application. I did what the secretary told me to do when I got the application. It was ten -- give them a minimum of ten years, sir. And that's what I did. I got hired --

Q You didn't give ten years.

A Okay.

Q You selectively left --

A Do the math.

Q You selectively left people off your application.

A Okay, well, why did Bill Schafer hire me because he had the final say.

Q He didn't know about those people apparently because it's not on your application.

A He needed drivers. He needed drivers just like she they needs drivers right now. The need drivers right now. They can't get enough people to haul these cars right now, and the way it looks, the damage rate is going to through the roof because they got -- it takes at least six months to a year to train a good car hauler.

Q Let's look at Exhibit Number 3, your employment application. You said you put down ten years' worth of employment?

Page 126

A I gave them what they asked for.

Q But there's not ten years worth of employment down here.

A Well, why was I hired then? Why was I hired?

Q Because you falsified your employment application.

A No, I did not. I didn't hire -- I did not falsify my application.

Q That's why you were hired. You testified that you put down ten years' worth of employment here. There is not ten years' worth of employment. The first one starts in 2004, CL Moore & Associates.

A Okay.

Q Ten years --

A I just -- on this --

Q -- would be 2001?

A I'm sorry. I'm sorry. I'm sorry.

Q So how is it that you think that you put down ten years' worth of employment?

A I just stopped working for Mr. Moore back in like 2012, 2013, okay. So as you can see, when I filled it out I was still doing work for him on the side driving for him. Okay. I got two years up here --

Q It's not ten years though. It doesn't even meet your own criteria, does it?

A Well, you tell me why they hired me if it didn't meet

Page 127

my own -- meet their criteria.

Q Because us falsified your employment application.

A No, I didn't falsify it. I'm not -- I'm not-- I did not falsify my employment. I did not. I emphatically deny that. I did not. I gave them what they asked for, which was enough to get me hired. You're looking at it -- and they hired me. Bill Schafer and his people hired me, they did their due diligence, they sent all this stuff to corporate from my understanding and corporate gave the okay.

Q It looks to me, and we've reviewed three employment applications, and each one of them has material omissions. It looks to me as though you have a practice of omitting material information from employment applications, right?

A Let's randomly pick -- just pick somebody else over there and go through their application and see if they left anything off and see if everybody's going to put every last job. I'm 46 years old, man. Do you really think I want to be sitting there writing that long? I gave them what they asked for, ten years, the minimum of ten years.

Q You say that but we just looked at Exhibit Number 3, and you do not have ten years' worth of employment here.

Page 128

A Yes, I do.

Q It starts in 2004.

A Uh-huh, 2004.

Q You applied in 2011. Are you with me so far?

A I'm looking at the application.

Q Ten years would be 2001.

A Two years down here in Davis Transport. CL Moore I just -- like I said, 2012, 2013 I just stopped working for him. I got a year with Accurate. Yeah, that's -- that's over ten years, man. That's ten years.

Q I see. Your theory is that CL Moore because you started in '04 and you're still working for them in 2011 that that counts as seven years?

A That counts for more than that because I was still working for them even while I was with Jack Cooper. I told you, I would do side work.

Q This is your theory, though, right? Your theory is ten years of employment, you add up CL Moore is as of January of 2001, that's seven years and 2011, and Accurate Auto Carriers is one year, you worked there from 4/09 you say to 7/2010, add those two up and that's --

A Davis Transport is two years. That was nine.

Q I see.

A And Accurate is -- is -- is ten. That's a year.



KEN GOODMAN
GOODMAN vs. JACK COOPER TRANSPORT, et al.

July 31, 2015
129–132

Page 129

Q   You really believe --

A   I got the job. You can laugh all you want to.

Q   You did get the job.

    (Brief recess.)

Q   (By Mr. Brook) Two questions I'm hoping we can answer. Have we covered every incident or event or decision that happened at Jack Cooper to you that you think was because of your race?

A   I thought I already answered that.

Q   I think so, but if the answer is yes, then yes. I mean, if you've got other things, I just want to make sure that we've covered it all.

A   I told you my -- my -- me personally and the seniority, those two issues.

Q   The seniority list being the make-up of the drivers, Caucasian and Africa-American drivers at the Lansing terminal?

A   Yes, yes.

Q   Have we covered everything that you can think of that supports your belief that race had something to do with Margo Hopkins looking at your application and then your termination?

A   Yes.

Q   Deposition Exhibit Number 9 I'm handing you now.

A   Uh-huh.

Page 130

Q   Do you recall receiving these two notices of reprimand for absenteeism while working at the Wayne terminal?

A   What I recall is asking for some time off to handle some family -- family business. That's what I recall.

Q   The top document, let's look at that. At the bottom is that your signature?

A   No, I don't -- I don't -- I don't usually sign my name like that.

Q   Do you recall Pat Kilar meeting with you about your attendance, the first one, 8/3/2012?

A   This one right here, right?

Q   Yes.

A   No, I don't.

Q   Pat Kilar signs here saying it was hand delivered to you. You're denying that Pat Kilar hand delivered to you this document about your attendance?

A   I didn't have too many interactions with Pat, and I recall asking for some personal time off because I had family issues. Bill Schafer gave me some time off. When I came back, I think this may have been in my box or something, my mailbox, but I did not -- this was not hand -- not handed to me by hand.

Q   I see. So it was in your mailbox, you saw it?

A   Yeah, and I refused to sign it because it's unfounded.

Q   That's page 2 of Exhibit Number 9, a typed up note from

Page 131

    Pat Kilar --

A   Yes.

Q   -- about absenteeism dated, 9/5/2012?

A   I guess that's who it's from. I don't know.

Q   Must have been just before you transferred to Lansing?

A   Seems like they was trying to get something on me.

Q   You were absent, were you not, on August 9th, 20th, 23rd through 27th, the 30th and the 31st?

A   I don't -- I can't answer that honestly because I don't remember. I don't.

Q   So if the records from the company concerning your attendance reflect these dates, then that would be accurate, right?

A   If they got it on record as far as my log books or whatever the electronic system they were using, but I don't believe so. I asked for some personal time off, that's why I did not sign this.

Q   When you asked, who did you ask for personal time off from?

A   My terminal manager, Bill Schafer.

Q   Bill Schafer gave you personal time off?

A   Yes, sir.

Q   And those days are covered you believe by the --

A   I believe so.

Q   When did Bill Schafer give you personal time off?

Page 132

A   I don't remember.

Q   Did he give something to you in writing?

A   Verbal.

Q   Did you submit something in writing asking for personal time off?

A   I went in and there and talked to him man to man and he said, take -- take some days off, get your affairs in order and come back to work.

Q   Nothing in writing was submitted asking for a leave of absence?

A   I didn't, no.

Q   He provided you nothing in writing granting a leave of absence, correct?

A   I don't remember. I really don't.

Q   You don't have anything in writing in your possession concerning a grant of a leave of absence for August of 2012?

A   I don't remember. But I know I had a very good reason not to sign it. I have to check my records when I get home.

Q   So was it your habit to not sign every notice of discipline or just the ones you disagree with?

A   It all depends. If I did it, I'll own up to it.

Q   And you'll sign the discipline?

A   If I did it -- see, it all depends on what it is. If I

